1588, Content Extraction v. Wells Fargo Bank. Mr. Wieser, is that how you pronounce it? My name is Anatoly Wieser. Wieser, okay, Mr. Wieser. Good morning. Morning. I'm here with my partner, Jean-Marc Zimmerman, for Content Extraction. May I proceed? Yes. The claims of our patents are not directed to mental steps. A person can look at a document and immediately, effortlessly, intuitively identify the different characters on that document, the different words, and entire fields of characters, such as amounts, addresses, salutations, perhaps. And it is not so simple for a computer to the program to do such things, because a computer, even before it can process the information, the information has to be presented to the computer. It has to be scanned, and the millions of tiny pixels on the page of a document has to be, they have to be converted into a stream of zeros and ones, bits and bytes that describe to the computer the information on the document that the computer can understand. Once the computer obtains this information with some involved programming, it can identify the different characters and entire fields, as we described in a way that would be understandable to a person skilled in the art. It is important to know that it's not only difficult for a computer to understand a writing, a document, but vice versa, it is impossible for a person to look at a stream of bits of zeros and ones and understand what characters they convey, what fields of characters they convey. The human brain is simply not adapted to do such processing. This is a qualitative difference in processing between the way a computer does it and the way a human brain does it. The entire field of artificial intelligence seeks to teach computers, program computers, how to do simple operations that human beings do routinely. A child can recognize a face, a facial expression. Is a person smiling? Is a person frowning? It is not so easy for a computer. Character recognition, text analysis, those are very important fields in artificial intelligence. Your client didn't invent some new way of performing optical character recognition though, right? No, we did not invent it. I understand your claim that it's using a generic form of a scanner, digitizing unit. A digitizing unit. To recover information from a hard copy document. Yes, but once you recover it, it turns into a stream of characters that again are not immediately, not easily recognizable for a computer by a computer. And then you need some processing to recognize the different fields such as amounts, salutations, addresses, account numbers. And our applications, our patents describe ways of doing several of them. What about your claims? Do your claims recite something that's novel about how the computers are recognizing these symbols or the symbols that have been turned into digital bits? The patent examiner thought so and if I can, if memory serves right, claims, for example, claim 9 and claim 10 of the 508 patent describes certain claims, certain ways of doing it. Relational, relations between different fields and relations between fields and some predetermined characters. Did you raise those claims to the district court? We did not discuss district claims, but we discussed others. We asked the district court to construe a lot of terms and there was no construction whatsoever. Additionally... Did you identify specific terms that needed to be construed? We identified a number of terms, but we did not identify all of the terms. We're dealing here with four patents, 242 claims. At the Rule 12, B6 stage, it is almost impossible to deal with this. There appears to be a contention that a computer essentially does the same thing as a human brain. If you think about it, a computer computes and that's what people do. People can compute mentally with an abacus, with a pencil and paper, but this should not disqualify the entire field of artificial intelligence, of software engineering, of information processing from the realm of patent-eligible subject matter under Section 101. These software-based inventions were not foreseen back in 1952 when the Patent Act was enacted. Neither was genetic engineering, and yet we have Chakrabarty to say that clearly it is patent-eligible subject matter. In Bilski, the Supreme Court decision in Bilski held that the machine or transformation test should not be the exclusive test of patent eligibility, in part because it would cast some shadow on technological fields that are part of the information age rather than the industrial age. We believe it is important that software-based inventions generally be considered to fall within patent-eligible subject matter. Could you say that the patent in AliceCorp was a software-based invention? I'm sorry? In CLF Bank versus AliceCorp, the Supreme Court, I think that one could regard that as a software-based invention. One could regard. That particular one was deemed to be ineligible under Section 101, so we know at least some categories of software-based inventions are no good under Section 101. We know that. Let's just assume for argument that there are some categories of software-based inventions that are okay. Why did yours fall in the latter category and not the former category? I have three answers to this question. One of them is that here we have an invention that is tied to a specific machine. It requires a scanner or a digitizer and requires specialized programming to process the information that comes out from the digitizer or scanner. The scanner is simply indispensable to the operation of the methods of the machines that we have claimed. Actually, I thought not all of them. I thought there's a passage in their specification that says roughly a human being inputting this is covered by some of these claims. It may say so in the specification, but I'm addressing the claims. The claims don't cover that. The claims, I do not believe, cover a human being. I cannot speak about all 242 claims now. Some of them specifically recite a scanner as part of a machine. Some do not. Some method claims receive information from a scanner or from a digitizer. Therefore, this part of the machine is absolutely integral to the invention. I think you had two more reasons. That's right. I wanted to cite the SIRF case and the research technology case. In the research technology, RCT case, the software was used to produce pixels that would eventually become pixels, information in the document. What we do is the converse of that. In other words, we analyze the pixels to obtain the information that was already on the hard copy document. In SIRF, the GPS case, the receiver received information, received signals from satellites and took those signals, converted them into a form that could be fed into the computer. Then the computer did whatever processing it did to come up with the position of the receiver. Again, all the receiver did was receive the signals from the satellite, the signals that were already there. I think that is a parallel case as well, as well as the SIRF case. I want to come back to the CLS bank case. There's a number of cases that came from this court, from the Supreme Court. Regarding 101, and specifically regarding the abstract idea exception to the Section 101 patent eligibility. One cannot miss the fact that most of them deal with what we think of legal intangibles. CLS bank itself, intermediation, Bilski, hedging, arbitration. Practically all of those cases deal with non-technological inventions, entrepreneurial inventions. Ours does not. Our invention does not deal with legal intangibles. It doesn't deal with tax, finances, investments, insurance. It deals with information. A couple of the early Supreme Court cases, the two mathematics cases, Parker and Benson, are obviously not financial practice cases. They're abstract for perhaps a different reason, but having to do with mathematics. We've had a couple of cases here, including Digitech. Is that the quite recent one about data by itself? So that at the heart of this is about dealing with information, recognizing it, storing it. Now, why isn't that enough to get to the second stage that the Supreme Court now prescribes? And Alice that says, show me something arguably inventive about the physical machines that you're using to do that. It's not clear what that is here. Obviously, there are some cases that are not limited to the realm of legal intangibles. Now, in Benson, there was a very simple, fundamental, basic algorithm that could be used anywhere for any purpose. And if you accept certain things about the laws of mathematics, how to transform a binary coded decimal into binary, it was one way of doing it, and they claimed that way. And the apparatus that they claimed was the fundamental, basic apparatus that covered the field as well. Now, in Fluke, I'm not sure it's all that easy to reconcile the holding in Fluke with the holding in Dyer a couple of years later. But again, there was no – there was a claim to a field of technology, but there was no direct connection to the physical, tangible world, claiming this is how we – this is an algorithm, and this is how we calculate alarm limits. What the alarm limits are, we don't know. But that's why – I mean, that's where Alice adds something, and a number of our cases, too, CyberSource and some others that say, if you look at what's going on before talking about whether a computer is involved and identify something abstract, then you do have to ask, what does the computer add to that? And now, in Alice's terms, what is inventive about the computer you're using to do that? Yeah, so if you invented a new optical character reader, that would – that might be an answer to that question. If you invented a new way of storing things that was particularly efficient or something, maybe that would be. But is there something like that in here, or is it simply saying, what we want to do is do what a human being does when looking at a check and recognize where the amount is and where the payee is and so on, and then storing it in a way that somehow are in our minds. We can do this, or we can do it with a pencil and paper. But we're not teaching anybody how to do that. We're just saying, use a computer to do what people have been doing for a long time. We have said much more than that. We have taken basic building blocks of human ingenuity. We added to them. We have disclosed how to identify the different fields, the different variables on the document, so that the parts of the information from those fields can be routed to the appropriate memory location. Can a human being do it? Yes. But does a human being do it in the same way as a computer? No. And that's why a computer can do the work of a human being. Excuse me. That is why a computer can process documents and save on each check $2 to $4, by our estimates, by published information. It's good to substitute machines for human labor. It's always been that way. And we have added something. We have shown how to do some of the things that were not known before. And I'm not sure to what degree we can confound the novelty of the 102 and 103 inquiries with 101. Obviously, this has been recently done. But I think just a bare minimum showing at this stage, especially. But the use of a scanner to read numbers on checks is decades old, right? You can use a scanner to digitize information, but the information doesn't come back as the characters that we're used to seeing. It comes back as descriptions of tiny little pixels, and there are millions and millions of them. What's the answer to my question? Is it not the case that it was well known to use a scanner to read numbers off checks? It was at some point known to scan information from documents. That's not your invention, right? It's not our invention, no. We take that. We go through optical character recognition, as Judge Chen noted, also not our invention. But then we show how to identify the different fields of the information on the document so that the document could, in fact, be processed. Because if you just scan a check, and then all you have is an image. A person, a human being, has to go back, has to identify the different fields of information, and has to input them into a computer in a particular way. What we do, that's not required. I think we're well over your time. We'll give you two minutes for rebuttal. Thank you. Good afternoon. Mr. Whitmer. Thank you, Your Honor. I'll be very brief. Whom do you represent? Oh, I'm sorry. I represent Wells Fargo. He's my client. But I'm speaking on behalf of all our police on the substance of the appeal. The 101 issue? The 101 issue. But not the RICO or tortious interference? Mr. Whitmer is going to speak for that for three minutes. I've reserved 12 minutes, and I don't propose to use 12 minutes. But you don't get any rebuttal? Correct. I would seek none. Very simply put, Judge Shipp's opinion answered the question that the Supreme Court told us in what I call ALICE, something called CLS Bank, but I call the ALICE Corp case. But the relevant question here is whether the claims do more than simply instruct the practitioner to implement the abstract idea of whatever it is. On a generic computer and in ALICE they said they do not, and that is the correct answer here. Because all of the activities, if you look at the summary of the invention, for example, of A105, I won't read that portion of the patent, but if the court reads that, they will see that the summary of the invention is simply to say, if you do this with a machine, you're going to save time and effort, and it won't be as long. My adversary suggests that they teach how to do this. I suggest that purely and simply the relevant question asked by the Supreme Court is whether these patents do more than simply instruct the practitioner to implement the abstract idea of extracting information, putting it down on a piece of paper, and transmitting it and storing it in some way. That can be done by a generic computer with the addition of a scanner. And Judge Dyke, your question, yes, scanners have been known for a very long time indeed. And there was nothing brought to the district court, your question Judge Chen. The district court was not called to attention with respect to any claims as to say, look at these claims. These claims have patent eligible subject matter, and you should look at these claims. And perhaps my adversary bespoke, the only thing that was told to the district court, and the exact language I think is found at A243 of the appendix, they told the district court that we anticipate that many of the claims will be disputed and will, as will other things. But there was no suggestion as to what the claim term should mean by either party. Rather, what the district court concluded, I think correctly on the basis of both the description that was given by PNC and by the description that was given by CET to the district court when the court's opinion says very plainly, and I think it's at A11, and I always bring a hard copy because I'm sort of the old school of the appendix. A11, the district court concluded that the basic character of the claimed subject matter in dispute in this action is clearly evident to the court and no further construction of the claim is required. And indeed there was no dispute as to what the basic character of the subject matter was. The judge looked at it and concluded that the subject matter of these patents was ineligible for patent in advance of the decision of the Supreme Court, and Ellis correctly decided that it was outside that scope and correctly dismissed the claims. You're not suggesting, I take it, that if you had say one patent, not four, but even more for four, and almost all of it was very familiar off-the-shelf stuff. One of the things described in the specification and then in some of the claims was, in fact, some technologically new way of doing what scanners are otherwise doing. But the inquiry wouldn't be, I forget your exact language, the basic subject of the patent or something. It's just that your position is it was their obligation to point out any specifics like that, and they didn't. The short answer to you is yes. The language that I use is actually out of this court's opinion in Bank Services v. Sun Life, calling the basic character of the claimed subject matter. And that very clearly was evident to the district judge. And you're absolutely correct what my position would be. In front of the district judge had, whether it was one patent, four patents, ten patents, it doesn't matter. If there's an argument about eligible subject matter, if the patentee comes in and says, wait a minute, look at these claims. Look at these claims that do X, Y, or Z that is inventive and is within eligible subject matter. What's the right answer with respect to what a district judge should do? Well, one of them is not to grant a motion on the pleadings with respect to at least those claims, whether it goes beyond that depends on what the pleading is here. And what I have believed in reading this, the pleading here was not you, Wells Fargo, and you, PNC, infringe claims 1, 3, 5, 7, and 9, but rather you infringe these four patents. And no specificity. Now that's perfectly permitted. No question about it. There's nothing wrong with that at all. But once the subject matter of the patents is made an issue as to whether or not they are patent eligible, and there's been a showing and a demonstration, as there was here, that the basic character of the claimed subject matter was not patent eligible, then it behooves, it seems to me, as a matter of not burden of proof, but burden of persuasion of coming forward to say to the district judge, wait a minute, look at these. If you look at these, you will see that at least these are within patent eligible subject matter, and then the district judge can decide. And it seems to me here, although there was some complaint about the representative quality of the claims that were discussed, there was nothing put to the district judge that suggested that there was any part of these patents that really did fall into the indented. Let's assume for the moment they had. Say they identified Claim 100, and they say Claim 100 is different from the representative claim, so it's inappropriate to treat Claim 1 as representative of all 242. Would that basically reduce the scope of the 12B6 down to the actual representative claim, because now a case has been made that the representativeness is not accurate? Well, Chen, I thought a lot about that kind of an issue. If I heard you correctly, you made it sound like there would be a carve out for Claim 100, but Claim 1 to 99 and then 101 to 242 would still be part of the group. Well, here's the difficulty I have, and I mean this as much as I can call myself a scholar of the law, I'll do that for a moment, as much as a student of the law at least, as an advocate. It seems to me that if, in fact, there were claims within each of the patents that could be argued, were argued, that wasn't done here. It was clearly not done here. They didn't argue that in response to some rate judgment motion. Correct. It's absolutely correct. It was not done here. And the old rule in terms of the district court couldn't have made an error because he wasn't showing anything that would suggest this. But let's say there were four patents here. And let me take one claim from each patent just to make it a little more complicated. Candidly, and that's not the case here, candidly, I don't know what exactly the right answer is, but at least with respect to those claims, if they're shown to fall within patent eligible subject matter, let's see how you can grant a dismissal motion with respect to those claims. What does it do to the rest of the claims within those patents? At the pleading stage, my intimation would say at the pleading stage, if you show that there is a claim within a patent that has patent eligible subject matter, and you've got 242 claims here to deal with, it seems harsh to say, well, we're only going to look at those four claims. That seems a little harsh. On the other hand, to say that you are going to dismiss the entire patent when there has been shown to be patent eligible subject matter within that patent, that seems a little harsh as well. So to me, the balance says, and it's almost procedural. I don't understand. You seem to be making this very complicated. You moved for summary judgment on the 242 claims. Pleading judgment on the 242 claims. And they didn't come back in and identify others that had something inventive about them in the computer, in the scanner. They effectively said this isn't the right time to do it. Well, so if they did identify some claims, those claims wouldn't be dismissed. The infringement suit wouldn't be dismissed as to those claims. Correct. Why is this so complicated? Well, I don't think it is in this case. I don't think it is in this case at all because nothing happened here. There wasn't anything put in front of the district judge. Nothing was put in front of the district judge that would suggest that any part of these patents had patent eligible subject matter. So the dismissal here is completely proper. I thought I was responding to Judge Chen's question. It was a slightly different hypothetical with respect to it. And in other circumstances, I think it does, Judge Stein, become a little more complicated. But it isn't complicated here. The subject matter of these patents was put into issue and was argued and shown not to be eligible for patent. The plaintiff, patentee, came in and I sort of colloquially say this is a little like the Casey at the bat. The pitch was thrown. He said, it's not my style, said Casey. Strike two, the umpire said. That is a circumstance here. They didn't say anything. It wasn't error for the district judge to look at what he looked at and to grant the judgment that he did at the time he did it. And any arguments, although those arguments have really not been advanced in this court, any arguments along the lines that Judge Chen and I were discussing made here are extra record and should be excluded. And for that reason, at least with respect to the appeal, with respect to the two banking defendants, the judgment should be affirmed. Unless there are further questions, I propose to sit down. Okay. Let's hear from Mr. Wentworth. Thank you. Your Honors, may I please support Roy Wepner on behalf of Diebold Incorporated. As you know, I'm here to just talk briefly about our cross-appeal from the dismissal by Judge Shipp of our damage claims for tortious interference in RICO. Okay. With respect to RICO, as I understand it, there are several circuits that have held that the filing of a frivolous claim is not a predicate act under the Hobbs Act. That's not extortion within the meaning of the Hobbs Act. So why are those circuits wrong? Well, first of all, Judge Shipp did not reach those issues, but I certainly want to answer your question. Those circuits did not address a situation like this one, in which there was an entire series of cases. Well, what difference would it make? If an individual case can't be extortion, what cases say that a series of cases makes it a predicate act when one individual case is not? Well, that was actually part of the analysis in the USS Costco case, which Judge Shipp cited on what we've called the series of lawsuits exception to the PRE case. I'm not talking about PRE now. I'm talking about the Hobbs Act. I'm talking about RICO. I understand. But the language was that there's something more serious about filing a series of cases. Is there any case that is held that there's a difference between an individual frivolous action and a series of frivolous actions for purposes of the Hobbs Act and a RICO predicate act? There was at least one case we cited in our brief that was a denial of a motion to dismiss against Mr. Lemelson. It was a suit against Mr. Lemelson. I think it was Wang versus Lemelson, which was, I believe, based on extortion. And the court declined. Which court? Was it a district court? It was a district court. There's no court of appeals case? Not that I can recall standing here, Your Honor. Okay. Now, what about the tortious acts and the Noor doctrine? Okay. The tortious acts. Your Honor, do you want me to discuss the elements of the tortious interference or go back to the Noor-Pennington? Why don't you start with Noor-Pennington? Fine. On the Noor-Pennington side, to be very clear, the judge relied basically on the PRE standard, which has two prongs. The first prong was that the suits must be objectively baseless. Judge Shipp found that we had adequately pleaded that prong, and indeed there were admissions in this record that the claims, parts of the claims were baseless. Parts. Parts of the claims. Parts, yes. You can go on, but I do want to get back to this. Why isn't it fairly plain that Noor-Pennington protects this on the ground that the district court did not rely on, namely that whatever this was, it's not objectively baseless. Alice was decided the day before yesterday. I'm sorry. I'm a little confused. Your Honor, the… What made these suits objectively baseless? It can't be 101 because we're making that up as we go along. Well, in this particular case, at a minimum, we have a situation where three other patents from this family with the same specification asserted by the same individuals under a different corporate umbrella had brought suits against numerous defendants. One of them, Toys R Us, had litigated the 101 issue. This was back certainly a few years ago, and even under the laws that stood then, Judge Hutchford… I'm sorry. You think you can plead objective baselessness of the assertion of Patent A because the same owner of Patent B had a meritless or even objectively baseless suit on Patent B? It seems to me that's just not even a remotely plausible basis for saying A is objectively baseless. Separate patents. Based on a legal ground that's been wildly in flux for the past five years. Well, the legal ground may have been in flux, but the basic claims of these patents have always been very, very similar. There's a very slight difference between the claims that were at issue in the Glory versus Toys R Us case, which was ruled against the patentee. An appeal was docketed to this court and the court, and they dismissed it. I guess I'm remembering, and tell me if I'm wrong in remembering. You made a motion, or they make a motion saying, nor Pennington immunity, you say sham. So part of your motion has to say, here's why this is objectively baseless. It seems to me you say a few things, none of which individually or together, plausibly suggests objective baselessness. One is that another patent, when asserted, was objectively baseless. And I don't see how that's a plausible basis for concluding that the assertion of this one was. You say the same owner, again, same owner can have different patents. I forget what the third basis was. I'm not even sure you said it was 101. Let's assume for a minute that the 101, even if they knew or write about invalidity, it wasn't objectively baseless. I don't understand what else there is in the argument. You have to make an argument against a motion to dismiss exactly the way they had to make an argument in response to the motion for judgment on the pleadings to say, here are specific reasons that the invocation of the movement is wrong. And I'm not sure what that is here. Well, Judge Shipp concluded that we had met the pleading requirement on the objective baselessness, and he cited prior decisions. I believe he was referring to the Glory case. He was referring to his own… Well, it wasn't clear to me that he was referring to Glory. Not specifically, no. The only thing he said was based on prior 101 decisions, and he didn't make any reference to any 101 decisions in that order. But in his prior order on granting 12B6 to PNC on 101, he had a lot of discussion about cases like Dealer Track, Bancorp, etc. And so those are the only case law decisions that, as far as I can tell, Judge Shipp had any contemplation about when he said what he said in determining that this was objectively baseless under 101. Judge Chen, if we go back to the decision invalidating the patents, one of the cases he did cite and discuss was the Glory decision. And he did make reference to the fact that these were patents owned by a closely related entity. And so you're right, he didn't specifically call it out. He didn't have that much specific to say in the opinion dismissing our claims. What are the tortious acts here? And when did they take place? We allege that the tortious acts were suing Diebold's customers, knowing that they were Diebold's customers, and knowing that Diebold… Bringing up the suits. Yes. Okay, and when were those suits brought? They were brought in 2012. Okay. Was the law clear in 2012 that these patents were invalid under 101? I believe it was, because among other reasons… When did this court's in-box decision in CLS come out? Last year, 2013. 2013. Yes. What was the vote on that one? It was evenly divided on some claims. Evenly divided, right. It was all over the place. All over the place. Yes, it was. So why was it clear in 2012? Because in this particular case, we think these claims do not present a close case at all under the law as it was evolving at any particular point in time. There were cases coming out of this court going back to 2010, 2011, that were invalidating patents that were very, very similar. And some cases going the other way. Not very many. It doesn't take very many for there to be enough uncertainty to produce a deeply split en banc and then leading to a Supreme Court case. I understand. I hear what you're saying, Your Honor. But Judge Shipp believed that we had, for pleading purposes, had adequately alleged enough grounds for saying that the suits were objectively baseless. And that finding has not even been appealed as an alternate ground by CET. They have essentially accepted that. Now, I obviously understand. Whether you're talking about objective baselessness or the subjective prong, to some extent, it's the same inquiry here. Under the subjective prong, they would have to know that the filing of these suits was frivolous, right? And we allege that to be the case. Right. So if we focus on the subjective prong, that is something they're appealing. Well, yes. And I'm prepared to discuss this. I know I'm way out of time, but I'm prepared to discuss it if Your Honors would like me to. But we have been discussing it. The subjective prong requires knowledge of frivolousness. Yes. And you can't very well have knowledge of frivolousness if the law is in flux. Your Honor, I would respectfully urge that the law is always in flux. The law never really stays still in any one of the areas that this Court has jurisdiction over. It is constantly changing. And you could always say that another case changed everything. Arguments could be made that Alice didn't really change much from Bilski. Bilski had been out there, I think, since 2010, if I'm not mistaken. The law, yes, it has changed. Perhaps it's gotten clarified in part because of the strong differences in this Court over what the proper rules were and proper standards were. But at the end of the day, I'm not sure the law has changed all that much in the last three or four years. Okay. Well, thank you, Mr. Weiser. Thank you. We're out of time here. Mr. Weiser? I want to come back briefly to what we have asked the District Court to do. And the record at 8236, 8237, we identified a number of limitations. What does it mean recognizing portions, storing information, receiving output from an automated digitizing unit? And this Court's review has been over here. So I believe you can consider all the other arguments about the need for claim construction, the need for some factual development to understand the meaning of the claims, to understand the meaning of the terms. Now, regarding the claims that we have actually discussed, each claim is considered to be separate, its own invention. There's a presumption of validity. A patentee should be able to stand on that. The burden was squarely on P&C to show that there was a problem with each and every claim. Now, as far as Wells Fargo goes, we have actually asserted claims. They were not the movement. So we have actually asserted a more limited number of claims. The District Court most likely would have limited it still farther, but there would be no need to analyze all 242 claims if we just proceeded to the initial stages of litigation, post-pleading. Now, this is not judgment of the pleading. I don't know if that makes a difference. It's Rule 12d6. But you did put all of the claims of each of your four patents in play when you identified them as being infringed in your complaint, right? We never said that each and every claim was being infringed. And given that this is a software-based invention, it would require probably some discovery to understand which of the dependent claims were being infringed. Some of the claims of each of the patents, after we have conducted some research, were clearly infringed to us. So why didn't you point out in connection with the motion to dismiss what individual claims were different from the ones that were being treated as representative? There are a total of 242 claims. Oh, you're the one who decided to assert 242 claims. Why don't you have an obligation to say these are different? Because each and every claim stands as its own invention because it is presumed to be valid. So you can remain silent. You don't have to say anything. We did not remain silent. It would be impossible for us to discuss even a reasonable number of claims. They discussed only two, and the burden was squarely on them because it was a Rule 12d6 motion and because the claims considered to be valid are presumed to be valid. We did not just sit on it. We asked the court that we needed construction of claims such as a template. What does a template mean? How is it produced? But this never happened, and the court said, and I don't have the words here. I do believe it's a record of A23 and A26, but essentially our claims, all of them, the patents, preempt the entire field of computer processing of documents. We believe that is not true. The preemption analysis should have been performed as Judge Lurie wrote in the en banc decision of Alice, and that view was endorsed by the Supreme Court, and I think the preemption analysis here was clear to show that claims are not preempting the field. And as a final thought, there must be— Mr. Weiser, I think we're out of time. We're over. Thank you very much. Thank all counsel. Thank you. Thank you, Mr. Chairman.